1710567 Warren v. Federal National Mortgage Association Well, losing your job is never a fun thing to do, but in terms of the types of ways that you can lose your job, losing it in such a way that it essentially bars you from the field where you have spent more than a decade working, building up a name for yourself, building up an income stream for yourself, is the worst way to go. And that's what we have in this case. We have a delightful employee, African American, who worked for Fannie Mae for approximately 16 years. Never anything bad on her in terms of her guidance. Her immediate manager didn't understand why she had been fired. Her superior, her second-tier manager, didn't understand why she had been fired. So they defamed her in the process. They damaged her reputation. There's no evidence that she got any money, right? No. I mean, the theory was that maybe there was an impropriety and maybe there were kickbacks, but what happened to Mr. Finch and Mr. Spinetto? That is the big question. They were both also blackballed. They were cut off completely from Fannie Mae. Mr. Spinetto is an interesting case because he came up with this business plan so that they had all these brokers out there helping them sell properties after the financial collapse in 2008. He said, you know, for small brokers out in the country, it's awfully difficult to comply with all these Fannie Mae rules and regulations. So he came up with a business plan. He went and he explained his business plan to a guy named Box, Mr. David Box, and he said, wouldn't it be great if I could go out and help these people comply with all of Fannie Mae's rules and regulations? We'll do back office support for them. We'll help them make sure everything is just the way Fannie Mae likes it, and it'll be seamless to you. We won't charge you any extra money for it, and Box said, great, and that's what started Mr. Spinetto's business. So all that was, of course, behind the scenes for my client. For my client's purview, she had never been given any counseling about what was back office support. All she knew was she was supposed to go out and find a new broker in an area. She asked her manager, can I go do that? She got permission to go do it. She went and there's a list of people who have applied. There's one person on the list, and that was the person that she picked. And another thing they do to make sure they're getting somebody good is they go and they look at brokers in other areas that could recommend someone. I'm going to interrupt only because the claim isn't whether Fannie Mae had good practices or this doesn't seem harsh in outcome. The issue is disparate treatment as to your client. So they may not have had right checks and balances. They may not have trained, but were people treated unequally? Isn't that the essence of? That is part of it, but it's not all of it. Remember, in post-Reeves, we can show pretext. We can show mixed motive. We don't have to show pretext plus. So we can show pretext by saying, here's an employee that's been there 16 years, never written up. Her manager doesn't understand why she's fired. Her manager's manager doesn't understand why she's fired. But the logic they present that seems supported to me was all those people that fell into this entanglement, too cozy with the brokers, giving them unauthorized access to things, they've all done an impropriety. But the ones that not only did that impropriety, confusing as it may be, but then had any aspect of concealment, we have to terminate. We're a big government entity, and the ones that in any way conceal from management, they're gone. And what's the flaw in that? How is there a singling out of your client? So what we have is a situation where some people got referred to investigations and got the third degree treatment, and some people did not. Of the people who were let go, they came up with a list, 11 of the 12 were minorities or women. So we've pointed out, what about David Box? You say, well, if you're not supposed to create a perception of impropriety, David Box approved the business plan for these back office services. David Box said, Mr. Spinetto, would you like to come do a commercial with me? I will put it on Fannie Mae's website so all the world can see that we think you're just a wonderful broker. And in fact... Is he the best comparator, just because there are quite a few you point to? Quite a few comparators. But who would you say is your best comparator? Shirley Small, same office. She added an office with Ryan Finch. Ryan Finch says, I don't understand why she wasn't fired too. Ryan Finch says, I was on a phone call. I agreed to be quiet during the phone call because she didn't tell her manager yet, and I didn't want to get her in trouble. When I read it, it looked like, for better or worse, your client suffered termination because there was the email where it looks like tacit agreement with, let's keep this under the radar screen. That phrase jumps out, and then again, for better or worse, she's honest when the investigators come and says, I didn't tell. And that's what gets her terminated. And sort of big government saying, people that know about impriority and choose not to tell it, affirmatively, that's termination. And Small didn't seem to have that type of email trail that implicates her in deliberately not disclosing what she knew was wrong. So, let me walk through this, because I think the evidence is actually clear that she did not conceal. Do you mind if I hand you a few exhibits? They're all in the record. Oh, yeah. Yes, I may? Yes, you may. Thanks. I hope this will simplify things a little bit. So, starting with this first page, this is the email that they are trying to say, well, this creates an implication that there's a conspiracy of silence here. But it does no such thing. What it says, Marsha, that was her immediate, Marsha Peters, her immediate supervisor, is not aware that you're in the area yet because the broker source had all of Emma's information. However, I will make her aware the next time that we have our monthly one-on-one. Not sure she's going to be a big fan, but I'll see. So, what this is, this is a statement that she intends to disclose the information. So, I mean, this is Hornbook law from more than a hundred years ago, the old Hillman doctrine, that the intent to do something can be evidence that the person actually does what they intended to do. This is a statement that she intends to make disclosure, not any evidence of a conspiracy that she won't make a disclosure. I have to say I got lost in the brief. I thought I knew Hillman from having taught evidence. That's a hearsay doctrine, that you can admit a statement of intent for the jury to infer a future fact. But here, this is, you're asking us to look at this statement of intent and infer the past. But right in Hillman, they had the letters, the famous letters from, and the question was, did the guy do what the letters indicated he intended to do? In other words, go off into these territories with Mr. Hillman. And if he did what he intended to do, then his body could be the one they found and were trying to... So, you're saying an email from an employee that's doing malfeasance, if that's what's happening. It's not, but... Well, something that she knows in the email, the managers wouldn't want to be a fan of what she's doing. As long as the email says, I intend to disclose it, the conclusion, there's a jury question as to whether she did by that statement of intent. Your statement of intent is evidence that she actually did so. I have difficulty with that, but I do know the Supreme Court case you're citing. Am I right or wrong that she did tell the investigators that she didn't disclose it, but then in her summary judgment declaration, she arguably says, well, maybe I did? Is that fair to say? She was not sure whether she did or not. To the investigators? To the investigators. But the investigators heard from Marcia Peters that she had been told this information. And when my client looked at the notes from the investigator, she said, well, I knew I intended to... That refresher recollection must have done it. Exactly. Okay. Exactly. And that gets into the sham affidavit problem. That does. Okay. Now, the second page, and I probably should have included one additional page. The second page is dated August 15th, and... Well, sorry, and I do follow both of you. What about the top one, so I can stay below the radar? That's fairly incriminating. Right? You highlighted it for us. Well, it is important, because we'll need that to be putting things in context. Okay. Again, this is not her saying, I'm going to keep you under the radar. This is saying, I can if you want to. All right. Again, there's no place here where my client says, yes, let's keep you under the radar. Did Ms. Small put anything? Is there anything suggesting I can keep you under the radar from my own bosses, from any of the comparators? That just seems to be a different level. I don't know that we saw an email of that from Ms. Small, but we did get testimony from Mr. Finch saying, oh, yeah, I was on the conference call, and I stayed quiet at her request, and they've not done anything so far as I know to Ms. Small. That's a good point. Okay. So between these first two emails, on August 1st, finally we get some guidance from Fannie Mae in terms of what you can and can't do on back office services. So August 1st, Mr. Cox sends to Marcia Peters, who sends to my client, here's what you can't do for back office services. Prior to that time, the evidence is clear. There was no guidance at all given to my client. As of August 1st, there was. So by August 15, there's a complaint that arises. The question is whether or not Emma DiGia is actually doing the work. And so my client is doing an investigation. She has correspondence with Mr. Finch. And at this point in time, basically what we've got here is Mr. Finch saying, Emma's happy with my services, but go ahead and have Marcia give her a call, if you like. So at this point, Marcia Peters can't say that she didn't know that Mr. Finch was participating. So the third page, these are the handwritten notes from the investigator. And so what's handwritten here is the investigator is talking with Marcia Peters, and she feels like Mr. Finch was trying to fly under the radar. And then under that, maybe, and then there's kind of something we don't quite understand, told her RF said that. So maybe she, Stephanie Warren, told her that. On the prior page, which is the last page, the investigator sometimes abbreviated Stephanie Warren's name SW. So maybe SW once told her RF said that. It's at least a plausible explanation. Summary judgment state, any plausible explanation, I'm supposed to get the benefit of the doubt. So my complaint is the trial court, I mean, basically she understands there's a change in testimony. She understands there's an explanation for the change in testimony, and yet she says, I'm going to make the decision here about whether anyone can believe you or not. That's clearly what she's not supposed to do. She's not supposed to be weighing evidence like that. We give a reasonable explanation for the change in testimony, refreshing from the doctor. What I understood was that basically Mr. Finch was running a kickback scheme. That's what my client was accused of doing is participating in a kickback scheme. There's absolutely no evidence of that. Well, that's what I was wondering about. I mean, the impression I had was maybe your client was sort of an unwitting dupe to Finch's scheme that was going on in other places as well. But if so, I would have expected Finch to have been indicted by now. He has not been indicted. I mean, he's been blackballed by Fannie Mae just like Spinetto was. But no, he's not had any charges brought against him. He gave a deposition. He seemed like an upright guy. He says, look, I went through this master listing agreement. As far as I could tell, I could do all this stuff. Well, now, what is his explanation if this is such a clear violation of their policies? It's not a clear violation of their policies. He said, I went through their policies and I couldn't see anything. In fact, Mr. Finch actively cooperated with the investigation because he didn't think he'd done anything wrong. What about getting access to Fannie Mae's information? That sort of thing happened all the time. One of the things we got from Mr. Spinetto is when he discussed his business plan with David Box, David Box must have known, yeah, of course you're going to need that. Access to their AMN network is something that their accountants would need. If they did any kind of consultants, multiple employees would have had access. He submitted the welcome package for her. I mean, he was there at the front end masquerading. But if she can hire someone in her office or she can hire a consultant to do that for her. But the policy is really clear. You can't give those ID numbers out. And what I'm saying is it's not. They didn't train on it, and David Box gave up his blessing on this business plan. And certainly my client was never given any such training. Okay. So I did just want to briefly say we think there's a very clear case that Judge Solis wiped out the defamation claim, and we think that's very clear he couldn't have. I'll bring that up in rebuttal. Okay. Ms. LePenatier. Your Honors, may it please the Court. Judge Higginson, you're absolutely right. The question in this case is whether Warren was terminated because of race discrimination, whether race discrimination motivated her termination. The record clearly shows that individuals who were found to have concealed information from Fannie Mae were terminated. There were four of those individuals. Two were white, one was Hispanic, one was black. On its face, that is not evidence of race discrimination. And the evidence put forth in this case doesn't establish race discrimination. The trial court correctly granted summary judgment, and we'd ask that this Court affirm, because there is no evidence of race discrimination in this case. But, you know, I mean, he is right, isn't he, that the standard is not that they're firing people of all races. The standard is whether the legitimate, nondiscriminatory explanation given by Fannie Mae is unworthy, is a pretext or unworthy of credence. And there's a lot, I mean, there's a lot that just doesn't add up here to me. Well, two things, Your Honor. First, under Reeves and under this Court's jurisprudence, Reeves doesn't say that. I'll file that. Let me just say that what Reeves said and what this Court has continued to say is that discrimination cases still require proof of discrimination. So there needs to be some evidence of discrimination, in other words, that there was some disparate application of a policy or a procedure or a practice, something. There wasn't that here. What happened here was that Fannie Mae's Mortgage Fraud Investigations Unit, a unit separate from the unit that did the investigation in this case, the Mortgage Fraud Investigations Unit heard about what Finch and Spinetto were doing, and they investigated it. The problem with what Finch and Spinetto were doing was that they were hiding their involvement with brokers with whom they were working. And that was a big deal because Finch and Spinetto were not approved to work in the areas with those brokers that they were working with. They weren't licensed. Fannie Mae didn't know that they were working with them. And the way that they accomplished that was they provided fake e-mails and fake phone numbers. So Fannie Mae thought that it was communicating with a particular broker who was licensed and approved in an area, when in fact it was communicating with Finch and Spinetto without his knowledge, who did know was Warren, and that was one of the issues in this case. He says there's evidence here that Marcia Peters knew that Finch was involved. There is no evidence of that, Your Honor. That's not what the record says. As I recall, the district judge didn't really address that. What the record says is that Finch had spoken with Peters on one occasion, and what Warren puts forth is that at that time Finch told Warren about this scheme. But the record evidence that is provided doesn't say that. What it says is that when she asked him about these areas, he didn't give her any information. So there's nothing in the record to identify that she was aware of meeting Peters. She being Peters, not Warren. Yes, that's right. There was nothing in the record to show that Peters was aware of this. And we also know that because during the investigation, as you pointed out, Your Honor, Warren admitted what she had done. She admitted that Finch had asked her to conceal information, and she said that he did that. She thought he asked her to do that because he didn't think that Peters liked him. She admitted that she told Finch she had not told Warren about his arrangement with DeGioia because she didn't think that Peters would be a big fan of it. She admitted that Finch told her that her manager didn't need to know if she didn't want to bring it up. Let me just ask you, I mean, the woman's been working there 16 years without a blemish, and it just seems very odd that suddenly this comes up that you say is such a clear violation of policy. I mean, this whole thing, when there's not actually a kickback, I can understand the concern about appearances and all that. So why don't you prosecute the people who may actually be getting kickbacks instead of firing people who have been there for a decade? Well, Your Honor, this court may believe that Fannie Mae's approach was unreasonable or inappropriate or wrong, but that's not what this court's job is to do. This court has made clear that it doesn't second-guess Fannie Mae's business decisions. And each of the individuals who was disciplined or who was terminated, the investigative decisions are set forth in the record. Each of them believed that, or contended at least. How many of them are suing Fannie Mae? Two. Two. There's a second individual who is alleged sandage, correct, and her basis is age and gender discrimination rather than race discrimination. So is this policy written in the handbook, or where would someone find it? The policy, Your Honor, is in our Code of Conduct, and the Code of Conduct says that you shouldn't engage in inappropriate, establish inappropriate conflicts with vendors, show inappropriate preference to a vendor over another. And again, the individuals who were disciplined and the individuals who were terminated would say that they didn't think they did. That's not their decision. It's Fannie Mae's decision. And Fannie Mae made a decision that their work with Spinetto and or Finch helped those individuals to accomplish a scheme that Fannie Mae's mortgage fraud investigations unit had determined was wrong. Fannie Mae can make that decision. It just can't apply it in a disparate way, and it didn't. I want to talk about Small for a second, because what plaintiff's counsel said was that there is evidence in the record that Small concealed, and that is not accurate. What the record says is that, well, I'm going to back up for a second to give you the context. The context is that Warren was involved in a conference call with her agents, and Finch was one of them. Prior to that conference call, Finch contacted Warren and said, you know, is Marsha Peters going to be on that? If she's on that call, will she hear me if I say my name? And what Warren told him was, no, I don't think she will. And so she helped him to conceal in that way. Now, what Finch said about Small was that he had participated in a conference call with her. He did not say, and there is no evidence in the record that suggests that he asked Small whether or not he would be concealed, that Small knew that he was trying to conceal it or that she participated in concealing it. But she stood silent. That's a thin distinction. It's not, Your Honor, because, number one, there's no evidence that Peters was in on that conference call. So there's no evidence that the conditions are the same. There's also no evidence that affirmatively establishes that she took an action. And that's what investigations had to base its decision-making on because it couldn't read minds. It had to look at the evidence. It had to look at all the e-mails and all of the documents and see what was in there. And as they pointed out, there is no documentary evidence. There is no evidence that indicates that Small in any way took steps, affirmative steps, to conceal. The e-mail that she receives and the honesty in her response to the investigator actually lead to a worse outcome. It does, Your Honor. And that's absurd, isn't it? It's not, Your Honor. It's not. I mean, so Ms. Small doesn't say anything, but she was present when Finch was hiding his participation, right? We don't know that, Your Honor. That's not in the record. There's no indication. There is no evidence in the record. And the investigative report goes through this and addresses the fact that it established that there was no concealment. What it shows is that she did not take any affirmative steps. And that is a line that they had to draw. Remind me again what the affirmative step is that Ms. Warren did. So there are a few, Your Honor. First, again, is her discussions with Finch about not telling her manager. And I want to be clear. She was aware. She was aware that Finch had asked her to conceal. There's that first e-mail where he says, please delete my information, because he didn't want anybody to know. Because, again, that e-mail was providing a fake e-mail and a fake phone number for this broker. So they were hiding this information from him. How did Warren know those were, quote, fake? Because Finch had told her that that information would go to him. Well, that doesn't – you know, a lot of people have more than one e-mail. That's just what occurred to my mind. Some of my colleagues have more than one e-mail. Right. And there's nothing wrong about that. The problem, Your Honor, was that Finch wasn't the e-mail. The problem was that Finch asked her to take his information off of it and that he also asked her to conceal the information that his involvement in this because he believed that Warren didn't like him. That information means and gave – I'm sorry. I do that frequently, and I apologize for that. Peters didn't know about it, and Warren knew that he didn't want Peters to know about it, and Warren helped him to conceal that. There is affirmative evidence in the record of that. There is no similar information like that with Small. Warren acknowledges that the concealment is the issue, and that's why she put forth the sham affidavit that was included in the summary judgment evidence. I want to talk about Hillman for just a moment. Before you get there, you said there were several affirmative steps. Oh. Could you get back to the first one? Yes. I'm sorry. I'm sorry. The others were that she was aware that Finch had indicated that he didn't want to – and she let him know that he wouldn't know about it. There was also her admission that she had concealed the information, and that's important because remember that this wasn't just a week or two that it was concealed. She began working with Finch and DeGioia in March of 2012. As of August, April, May, June, July, five months later, she still had not disclosed that. As of the time of the investigation, she still had not disclosed that. About a year, two years into this litigation, back in 2014, 2015, she submitted an affidavit in which she said, with certainty, I did not tell Peters. That was sworn testimony that she provided. So that's later. But at the time of the investigation, what investigations knew, what its good faith basis for its determination – Are you talking about the information that was in the district court about the difference between Warren's later affidavit and her testimony? Because, frankly, I didn't read her testimony as being quite as unequivocal as you're saying. In the first affidavit? In her deposition, it seemed to me, she was waffling. I mean, she was uncertain about whether, which people could be. There are several stages in this litigation, Your Honor. The first stage was at the investigation point, and that's what's relevant here, right? Because the question is, what did the investigators know when they made this decision? What did they base their decision on? And the information that they knew at the time of the investigation was that she acknowledged that he asked her to conceal it. She acknowledged that she did conceal it. During her deposition, yes, she waffled a bit. She unwaffled herself with the first affidavit that she submitted a couple of years ago, where she said with certainty, I did not tell her. But then she attempted to waffle again at summary judgment with the submission of an affidavit that said that she may have said, she may have told her manager, although, and this is important, she says, I can't say with certainty. So the district court didn't err in excluding that for two reasons. First, it doesn't say that she did tell Peters. It is speculative. It says, I think that I might have, looking at documents years later, but I can't say with any certainty. She clearly says that. It also doesn't address the good faith basis that investigations relied on when it made its determination, because they didn't have the benefit of anything that happened after the investigation. And the district court didn't. So what Box set up with Spinetto, because it was in the open, was perfectly okay, even though Finch might have been doing exactly the same thing, but that's a violation of policy. Is that right? There's no evidence that what Box was aware that Finch was doing was the same thing. I'm not talking about Finch. I'm talking Box Spinetto on the one hand and Finch on the other hand, because it seemed either to me that Finch was setting up all the underlings in order to get a better deal for himself, but that doesn't seem to be the case, or that Finch was doing something really bad like getting kickbacks, because the word kickbacks does show up here in the briefing, and that he ought to be indicted, which he has not been. So I'm very confused about the discrepancy between how can Spinetto do this on the up and up and Finch can't. There's no evidence in the record, Your Honor, that Spinetto was allowed to do this on the up and up. He did. He went and set up that Blackhawk group, right? And once Fannie Mae learned what Blackhawk was doing in terms of the fake e-mails and the fake phone numbers and all of that, it eliminated those relationships. It took the same action with respect to Spinetto as it did with respect to Finch, and it's taken the same approach with respect to individuals who worked with Spinetto as it took with individuals who worked with Finch. Box did not approve what this scheme was, contrary to what plaintiff has told you. Box, and the testimony is clear from both Spinetto and from Box, Spinetto didn't tell Box, I'm going to use fake e-mails and fake phone numbers to hide my involvement in this. He didn't tell him that. Had he told him that, Box would not have given any sort of approval. He didn't tell Box, I'm going to get the AMN access. He didn't tell Box the things that mortgage fraud investigations concluded were the bad things. So there was no approval of what Spinetto was doing, just as there was no approval of what Finch was doing. May I ask you about the defamation claim? Because, frankly, I understand what you're saying about the arbitration not preceding the lawsuit, but it's not even binding arbitration, right? If it's not binding arbitration, how can the fact that it occurred after the lawsuit was filed be dispositive against a defamation claim? Well, first, Your Honor, the issue on the defamation, the procedural issue as to 12b-3, was waived by plaintiff because it wasn't raised at the district court. They didn't argue that that was the incorrect procedural approach, and to the contrary, they argued that the court wasn't appropriate. Well, you're justifying it also on summary judgment. That's right. So let's get to what's really going on. Okay. The arbitration agreement, which is in the record, stated that a contractual prerequisite, a prerequisite to the arbitration being nonbinding, in other words, to you being able to reject the award if you were dissatisfied with it and go to court, the procedural requirement was that you bring your claim in arbitration in a timely manner. There is no dispute in the record. Warren has never argued, has never contended, and has never disputed. She did not bring her claim in arbitration in a timely manner. The defamation claim was raised in arbitration after the statute of limitations had expired. As a result, under the terms of the arbitration agreement, she did not have the right to reject the arbitration. It's nonbinding. So what's the big deal? It's only nonbinding, Your Honor, if you follow the contractual prerequisites, and the big deal is that the Federal Arbitration Act was specifically adopted for the purpose of ensuring that arbitration agreements are enforced according to their terms. A term of this arbitration agreement was that it only became nonbinding if you brought it in arbitration in a timely manner. What's the remedy? I thought the contract said your remedy is to assert that to the arbitrator, and it was, but the arbitrator went to the merits anyway. How do you recover that? The arbitrator went to the merits, but first we did raise this issue with the arbitrator, and the arbitrator simply declined to rule on it. He said that he wasn't deciding one way or the other. So it remained an open question, and it wasn't waived. What the agreement says is that the arbitrator may be asked to rule on it. That doesn't preclude, that language doesn't preclude the court from ruling on it. And further, because the facts were undisputed, because there was no argument from plaintiff that she had, in fact, brought this defamation claim in a timely manner, because of that, the trial court could make that determination. We couldn't do that in the first instance. I'm sorry, Your Honor? We wouldn't be able to do that in the first instance. We being this court? Yes. If it had not been addressed at the trial court, that's correct. But the trial court did decide that. The trial court, in ruling on the 12b3 motion, specifically said that it was doing that because the arbitration agreement had been satisfied. But you're not disputing that 12b3 isn't the proper vehicle. We do believe 12b3 is the proper vehicle, Your Honor. What we are saying is that if this one, number one, this Court doesn't need to decide whether it is or is not the proper vehicle because the claim was waived by plaintiff. But if this Court were to have any question or concern about whether 12b3 was the appropriate vehicle, it's an immaterial and harmless error because the trial court could simply have converted it to a motion for summary judgment and ruled on those grounds. Summary judgment based on what? Failure to exhaust, basically? But, I mean, if the arbitrator, it will be assumed but not decided that the defamation claim is eligible. But he didn't rule on it, right? That's right. So... But if it was an issue for the arbitrator, I mean, it still is an issue for the arbitrator, isn't it? We do believe it is, Your Honor, because the facts are undisputed, because there is no question as to whether or not that was raised originally with the arbitrator in a timely manner. We think it was something that the trial court could decide. But, again, I mean, it's not been decided by the arbitrator. He refused to decide it. So, you know, I understand your argument about the necessity of adhering to the agreement and exhausting and all that. But, basically, you're saying that although you don't dispute that the arbitrator had the issue, he didn't decide it. And, therefore, she's out of court completely. It's not even a question of enforceability or non-enforceability or non-binding or whatever. Your Honor, I have four seconds. May I respond to this question? Yes. Okay. What we're saying, Your Honor, is that she acknowledges that she failed to bring the claim. When we moved under 12b-3, we gave the trial court the option. We said, Your Honor, we said, trial court, we would like you to decide this because we think that it is undisputed and that it is appropriate for you to determine this. If you think it is more appropriate to send it back to the arbitrator, then you can do that. The trial court, because the facts were undisputed and because the arbitration agreement was We believe this court should affirm. But if the court believes that it should go back to arbitration, then it should go back to arbitration. Which would be non-binding, and then what would happen? The question would be whether the only question that would be presented if this were to go back to arbitration would be whether or not she timely brought her claim. Actually, that would be up for the arbitrator to decide, wouldn't it? Well, the arbitrator has already decided on the merits. Arbitrators are arbitrators. They get to decide whatever they want. Except that there is already a decision in this case that the defamation claim was not valid on its merits. I've never heard of a law of the case being applied to arbitrators. I believe it would be, Your Honor. You can argue what you want. Okay, thank you very much. Thank you. Okay, Mr. Crouch. So, again, we think that, at the very least, my client ought to be able to try her defamation claims. Ought to be able to what? Try her defamation claim. Clearly, Rule 12b-3 is not the right vehicle. Obviously, it would have been better if I had cited the Supreme Court case that shows that their motion was ill-considered. We did oppose the motion. We thought it was an ill-taken motion at the time. The arbitrator is the one who gets to decide what he will and won't hear. There's not actually a statute of limitations defense because the defamation claim was brought within the one-year statute of limitation under Texas law. It just wasn't also brought in the arbitration within that one-year window. So the relief you want on this portion is what? Reverse and remand for trial on the defamation claim. To the arbitrator or to the court? To the court. Why wouldn't he go to the arbitrator if he goes back? There's no point in sending it to the arbitrator. The arbitrator used his discretion to entertain the merits, made a decision. We rejected the decision because it's non-binding. There's no point in sending it back to the arbitrator. Who resolves the untimeliness problem? The arbitrator gets to resolve what the arbitrator doesn't do. But you're saying it doesn't go to the arbitrator. The arbitrator has already decided to consider the merits. The arbitrator found against us on the merits. We rejected his decision as we have a right to do. Doesn't that subsume timeliness? This court does not get to review the arbitrator's decision on whether to consider it. Exactly. Doesn't the arbitrator's decision subsume timeliness? Exactly. The arbitration agreement says the arbitrator gets to examine the scope of the agreement and whether or not to consider it. He's done so, so there's no point in sending it back. The motion never made any sense, but obviously it's procedurally defective under the Supreme Court's guidance that you can't do that with Rule 12b-3. Anything else? I think that covers it. Thank you so much. Thank you very much.